# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA CLARKSBURG

**MELVIN GIVENS,**

        **Plaintiff,**

**v.**                                    **Civil Action No. 1:15cv111**
                                               **(Judge Keeley)**

**C. WILLIAMS; C. EICHENLAUB;**
**ELLEN MACE-LEIBSON; JAMES**
**NOLTE; JOSHUA HALL,**

        **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural Background

On July 2, 2015, the *pro se* Plaintiff, Melvin Givens, filed a civil rights case against a number of defendants alleging a violation of his Eighth Amendment rights. ECF No.1. The complaint brings suit against the Defendants in their individual capacities pursuant to <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971). On June 7, 2016, the Defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment. ECF No. 35. A Roseboro Notice was sent to Plaintiff on April 7, 2016, notifying Plaintiff of his right and obligation to file a response. ECF No. 37. The Plaintiff filed a response on August 1, 2016. ECF No. 45.

### II. Factual History

On February 27, 2009, the Plaintiff was transferred to the Federal Correctional Institution in Gilmer, West Virginia ("FCI Gilmer") from another Federal facility. During his initial medical screening on February 28, 2009, Defendant J. Hall, RN,

documented that the Plaintiff's last purified protein derivative ("PPD") test was less than a year old and was negative. ECF No.36-2 at 13. According to the Declaration of Dr. Mace-Leibson, the Plaintiff was removed from FCI Gilmer pursuant to a federal writ on April 10, 2009. ECF No. 36-2 at 3. On that same date, at the Central Detention Facility in Washington, DC, the Plaintiff was administered a PPD test, which was negative. ECF No. 36-2 at 28. He also had a chest x-ray that was negative for infiltrates. Id. at 29. On May 14, 2009, the Plaintiff was medically cleared for federal transfer [ECF No. 36-2 at 32] and arrived back at FCI Gilmer on May 15, 2009. Id. at 32.

On October 21, 2009, Dr. Mace-Leibson noted that the Plaintiff had just tested positive for tuberculosis ("TB") exposure on an unscheduled PPD test. The test was done because of a recently diagnosed TB case at FCI Gilmer. Dr. Mace-Leibson evaluated the Plaintiff and noted that he was asymptomatic. She ordered pretreatment x-rays and labs, follow-up appointments were scheduled and medications were explained. ECF No. 36-2 at 45-47.

On October 21, 2009, a radiology report indicated that the Plaintiff's chest x-ray was abnormal, indicating left hilar nodal enlargement. ECF No. 36-3 at 2. On October 28, 2009, a consultation request for a CT scan of the chest was approved. Id. at 4.

On November 30, 2009, an administrative note was entered by Dr. Mace-Leibson indicating a CT scan was done on November 23, 2009, but it was conducted without contrast and needed to be rescheduled with contrast. ECF No. 36-3 at 5.

On December 3, 2009, another BOP physician entered an administrative note

that the October 27, 2009, AFB smear was negative, and the culture was pending.[1] ECF No. 36-3 at 6. A repeat culture was obtained on December 15, 2009 Id. at 7, and on December 18, 2009, Dr. Mace-Leibson made an administrative note in which she noted the sputum samples so far were negative, but there were problems obtaining them, and the CT scan would need to be repeated with contrast. Dr. Mace-Leibson also documented the need to use Rifampin for treatment due to the resistance seen on the culture of another recent positive TB patient, and the possibility that she might need to consider multi-drug treatment. ECF No. 36-3 at 8.

On December 22, 2009, Dr. Mace-Leibson met with the Plaintiff and prescribed Isoniazid and Pyridoxine, and he was counseled on the new medication. ECF No. 36-3 at 10. The following day, Dr. Mace-Leibson met with the Plaintiff and re-interviewed him about possible TB exposure. The Plaintiff revealed that he had contact with an inmate who had also tested positive for TB exposure recently, stating that he had contact with that patient both at FCI Gilmer and on the street. It was noted that the Plaintiff was willing to take the four-drug treatment and be placed in isolation for four weeks. The multi-drug treatment was prescribed for six months and consisted of Rifampin, Isoniazid, Pyrazinamide, and Ethambutol. ECF No. 36-3 at 11-12.

On January 22, 2010, the Plaintiff was evaluated by optometry and found to have branch vein occlusion and significant vascular scarring of the right eye, with mild periphery of the left eye also. He was then referred to a retinal specialist. ECF No. 36-

---

[1] An Acid-Fast Bacillus (AFB) smear and culture are two separate tests. An AFB smear is used as a rapid test to detect mycobacteria that may be causing an infection such as tuberculosis. The other main mycobacterial infections are leprosy and a TB-like disease that affects people with HIV/AIDS. To do an AFB culture, phlegm or sputum is put in a special container with food the bacteria needs to grow. It is checked over a few weeks' time to see whether the bacteria grow.

3 at 16.

On March 9, 2010, an administrative note was entered by Dr. Mace Leibson which indicated that the Plaintiff's chest x-ray done on March 2, 2010, indicated "decreasing size of left hilar adenopathy as c/w 10/09" with plans to repeat the chest x-ray in two months. ECF No. 36-3 at 21.

On April 7, 2010, the Plaintiff was seen at the WVU Department of Ophthalmology upon referral for evaluation of his right retina due to vision changes over the last two months. On dilated fundus exam, he was found to have several areas of tractional retinal detachments and vitreoretinal traction in the mid-periphery. On fluorescein angiography, the right retina did show multiple areas of tractional retinal detachments, attenuated blood vessels, hard exudates and areas of non-perfusion. Based on this examination, the examining ophthalmologists stated that "[o]ur impression is that he has a retinopathy process with the differential being sickle cell electrophorese, HIV, CMV, HSV, and VZV. There is also the possibility that this could be related to posterior uveitis." ECF No. 36-3 at 28. Accordingly, it was recommended that medical staff at FCI Gilmer check labs for sickle cell electrophoresis, HIV, CMV, HSV, and VZV. They also recommended treating him with possible laser photocoagulation. In conclusion, they noted that they had "made an appointment for follow up after your completion of his lab work and have sent lab orders with the guards." Id.

On April 9, 2010, an administrative note was entered by Dr. Mace-Leibson following the ophthalmology consultation performed on April 7, 2010, at the West Virginia University Eye Institute. The diagnosis was listed as retinopathy and tractional

retinal detachments of the right eye, and the treatment was listed as laser therapy of the right eye. With respect to the lab testing recommended by WVU, Dr. Mace-Leibson noted that that the Plaintiff had already been screened for HIV and RPR[2]. It appears she then ordered laboratory tests and a patient history for cytomegalovirus, varicella, herpes simplex virus and zoster virus. ECF No. 36-3 at 26.

On April 26, 2010, Dr. Mace-Leibson made an administrative note that Plaintiff had completed 120 doses of the recommended multi-drug treatment regimen prophylaxis for TB exposure and was being discontinued.[3] ECF No. 36-3 at 30.

On June 8, 2010, the Plaintiff was seen by Eddie Anderson, DO in the chronic care clinic for a chief complaint of hypertension. He was assessed as having benign essential hypertension which was not improved. He was advised that he needed to consider blood pressure medication, and it was noted that he understood the risk to his eyes, heart, kidneys, brain, etc. due to his high blood pressure. A new consultation request for ophthalmology was made to obtain laser intervention. ECF No. 36-3 at 33.

Finally, on November 30, 2010, Dr. Mace Leibson entered an administrative note that a utilization review request for optometry consultation was approved, and the Plaintiff would be scheduled for this consultation. ECF No. 36-3 at 43. Dr. Mace-Leibson did not address this note in her Declaration, and it is unclear whether this was actually a new consultation request for ophthalmology, a redundant note regarding the June 22, 2010, approval, or simply a request for an optometric consult as opposed to an ophthalmological consult.

---

[2] The rapid plasma regain (RPR), RPR titer, or RPR test refers to a type of rapid diagnostic test that looks for non-specific antibodies in the blood of a patient that may indicate a syphilis infection.
[3] This Court notes that when initially prescribed, the multi-drug treatment was for six months, not 120 days.

Despite the fact that a review of the Plaintiff's administrative grievances establishes that he underwent a retinal attachment to his right eye on February 12, 2012, and some type of eye surgery on November 17, 2013, the Defendants have provided no medical records post-dating November 30, 2010. Although Dr. Mace-Leibsen's last working day was December 23, 2010, this Court must assume that the Plaintiff continued to receive care in the chronic care clinic and administrative notes would have been made regarding the Plaintiff's procedures at WVU post 2010.

### III. The Pleadings

#### A. The Complaint

Plaintiff's first claim is that the medical care he received at FCI Gilmer violated his Eighth Amendment rights because staff failed to screen him for TB upon his arrival at that facility on February 27, 2009. The Plaintiff names C. Williams as a Defendant in this claim. The Plaintiff's second claim is that Dr. Mace-Leibson failed to give him a PPD test when he arrived at FCI Gilmer, and he was then exposed to TB at that institution causing him to suffer a detached retina and permanent vision loss. The Plaintiff's third claim is that Dr. Anderson violated his right to medical care by failing to give him medical care and prolonging his treatment for his eye condition.[4] The Plaintiff's fourth claim is that Joshua Hall, a RN, violated his Eighth Amendment rights by prolonging his treatment for his eye condition, which caused him to suffer a detached retina and resulted in permanent vision loss. The Plaintiff's final claim is that Defendant Eichenlaub

---

[4]This Court notes that the Plaintiff did not name Eddie Anderson in the style of the case, nor did he list him as a Defendant. Accordingly, Dr. Anderson has never been served. However, in the body of the complaint, under claims, the Plaintiff clearly alleges that Eddie Anderson is a doctor at FCI Gilmer and prolonged his treatment for his eye condition. ECF No. 1 at 8. In addition, the medical records provided by the Defendants contain clinical encounters in which Eddie Anderson, DO is the provider as well reports cosigned by him. ECF Nos. 36-3 at 31-34; 35; 40; 41.

knew that his rights were violated but still denied his complaint.[5] For relief, the Plaintiff

seeks $2,000,000 against each Defendant.

B. __Motion to Dismiss/Motion for Summary Judgment__

First, the Defendants argue that the Plaintiff's claims must be dismissed for failure

to file within the statute of limitations. Second, the Defendants argue that the Plaintiff

cannot establish an Eighth Amendment violation for inadequate medical care. Third, the

Defendants allege that the Plaintiff failed to allege constitutional violations against the

named Defendants, and they are entitled to qualified immunity. Further, the Defendants

allege that this Court lacks personal jurisdiction over Defendant Eichenlaub. Finally, the

Defendants argue that Defendant Nolte is a U.S. Public Health Service Employee and is

entitled to absolute immunity.

C. __Response__

In response to the Defendants' Motion to Dismiss/Summary Judgment, the

Plaintiff sets forth the same statement of facts as outlined by the Defendants.  The

Plaintiff then argues that his claims are timely because of the "continuous wrong"

standard of tolling.  The Plaintiff also argues that he has established an Eighth

Amendment violation for inadequate medical care and deliberate indifference.

## IV.   Standard of Review

A. __Motion to Dismiss__

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as

true all well-pleaded material factual allegations.  Advanced Health-Care Services, Inc.,

v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990).  Moreover, dismissal

---

[5] Although the Plaintiff names James Nolte as a Defendant in the style of the case and under the parties section, he does not mention him in any of the claims.

for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## B.   <u>Motion for Summary Judgment</u>

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).   The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."   <u>Matsushita Electric Industrial Co. v. Zenith</u>

Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

Plaintiff is proceeding *pro se* and therefore, the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97 (1976); Haines v. Kerner, 404 U.S. 519 (1972) (*per curiam*); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leake, 574 Fed 2nd 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, 404 U.S. at 520 – 21. The mandated liberal construction means only that of the court can reasonably read the pleadings to state a valid claim on which Plaintiff could prevail, it should do so. Barnett v. Hargett, 174 Fed 3rd 1128 (10th Cir. 1999). However, a court may not construct plaintiff's legal arguments for him. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

IV.  **Analysis**

A.  **Timeliness of the Plaintiff's Complaint**

The Defendants argue that the Plaintiff's complaint should be dismissed because it is untimely. The Court is unpersuaded by the Defendants' argument because the complaint was filed within the statute of limitations.

"State law supplies the statute of limitations applicable to <u>Bivens</u> actions." <u>Noll v. Getty</u>, 995 F.2d 1063 at *2 n.2 (4th Cir. 1993) (citations omitted). West Virginia Code § 55-2-12 provides that "[e]very personal action for which no limitation is otherwise prescribed shall be brought . . . (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries." Therefore, a two-year statute of limitations applies here.

"Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." <u>Nasim v. Warden, Maryland House of Correction</u>, 64 F.3d 951, 955 (4th Cir. 1995). The Plaintiff undoubtedly possessed sufficient facts to learn of his cause of action in October 2009, when he was diagnosed with tuberculosis. However, "the prisoner is entitled to equitable tolling of the applicable limitations period while he [exhausts administrative] remedies." <u>Young v. Thompson</u>, No. 2:10-CV-66, 2011 WL 3297493, at *4 (N.D.W. Va. July 29, 2011) (citations omitted).

The Bureau of Prisons provides a four-step administrative process beginning with attempted informal resolution with prison staff (BP-8). If the prisoner achieves no satisfaction informally, he must file a written complaint to the warden (BP-9), within 20 calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the warden's response, he may appeal to the regional director of the BOP (BP-10) within 20 days of the warden's response. Finally, if the

prisoner has received no satisfaction, he may appeal to the Office of General Counsel (BP-11) within 30 days of the date the Regional Director signed the response. An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels. 28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

As previously noted, the Plaintiff has exhausted two separate grievances which this Court believes are related to the pending complaint and which toll the statute of limitations. The first, Remedy ID No. 653147 was filed at the facility/institutional level on September 26, 2011. The grievance concerns the Plaintiff's request for eye surgery which he notes was approved by Grand Prairie[6]. By the time the Plaintiff filed his BP-11, he apparently had undergone a retinal attachment to his right eye on February 27, 2012, with post- operative review on March 7, 2012. ECF No. 36-1 at 16. The second, Remedy ID No. 718988, was filed at the facility/institutional level on January 13, 2013. The Plaintiff raises issues concerning the treatment of his TB and his assertion that during his treatment with Rifampin, he began to experience eye problems. The Plaintiff maintains that he became blind in his right eye and his left eye was seriously weakened by carrying the load of both eyes. He also alleged that he had developed cataracts in his left eye. According to the response to his BP-11, the Plaintiff was evaluated on November 13, 2013, by physicians at the WVU Healthcare Ophthalmology-Eye Institute. Subsequently, eye surgery was performed on November 17, 2013, and a post-operative visit was conducted on December 9, 2013.[7] Accordingly, the evidence shows that the Plaintiff pursued his cause of action as one continuous claim through several informal

---

[6] Although not clear, this Court believes that the Plaintiff may be referring to the Utilization Review Committee.

[7] If accurate, this would be a second surgery on the Plaintiff's eye.

and formal channels. His last administrative appeal was not denied until June 19, 2014. ECF No. 36-1 at 8. Therefore, his complaint, which was filed on July 2, 2015, was filed within the statute of limitations.

This Court acknowledges that the Defendants argue that his last administrative action should not toll the statute of limitations because he failed to assert that he was not screened for tuberculosis. However, the informal grievances clearly state that upon arrival from USP Big Sandy on February 24, 2009, he was not screened for TB. ECF No. 36-1 at 19. In addition, the BP-9, which was tendered to this Court by the Defendants, is missing the first page, but does indicate on the second page that "Grievant was finally screened for Tuberculosis (TB) during the month of September 2009, a full seven months after his arrival here at FCI Gilmer." ECF No. 36-1 at 20. Therefore, this Court finds that it did assert issues regarding TB screening and clearly relates to the injury complained of here. Moreover, this Court recognizes that the Defendants argue that when he initiated the second grievance on January 2, 2013, he was procedurally barred under BOP regulations from bringing any claim related to a delay in care before the eye surgery in February 2012, because he was many months past the 20 days he had to bring that administrative remedy. However, the Plaintiff's grievance was not denied as untimely[8], and as noted above, the Plaintiff is alleging a continuous pattern of inadequate care. Accordingly, this Court believes that it would be improper to dismiss this case as barred by the statute of limitations.

## B. Defendants C. William, Warden; C. Eichenlaub, Regional Director

Liability in a <u>Bivens</u> case is "personal, based upon each defendant's own

---

[8] The two cases cited by the Defendants both involved grievances which were denied as being filed outside the time limits proscribed by BOP policy.

constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir.2001) (internal citation omitted). Therefore, in order to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3d Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976). Because vicarious liability is inapplicable to Bivens and Section 1983 suits, a plaintiff must plead that each government-official, through the official's own individual actions, has violated the Constitution. Ashcraft v. Iqbal, 556 U.S. 662 (2009). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own conduct." Id. at 1948-49.

With respect to Warden William and Regional Director Eichenlaub, the Plaintiff asserts no personal involvement on the part of either defendant in the alleged violations of his constitutional rights. Instead, liberally construed, the Plaintiff merely asserts that those persons had supervisory authority over the alleged violators and that they should have done something to prevent the alleged violations of his rights. In Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a Bivens action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison

physicians' constitutional violations."   In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury."   Id.   However, the plaintiff cannot establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs.   Id. Rather, the plaintiff must show that a supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice.   Id.

In this case, Plaintiff has not provided any evidence that these Defendants tacitly authorized or were indifferent to an alleged violation of his constitutional rights. Instead, it appears that those defendants simply failed to grant Plaintiff relief during the administrative process.   However, an administrator's participation in the administrative remedy process is not the type of personal involvement required to state a Bivens claim.   See Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003). Accordingly, Plaintiff cannot maintain a Bivens claim against either Warden Williams or Regional Director Eichenlaub.   Moreover, in reviewing claims of medical care, supervisors are entitled to rely on the judgment of the medical staff as to the course of treatment prescribed. Thus, even assuming these supervisory defendants had notice of Plaintiff's administrative grievance regarding his medical needs, it does not rise to the level of personal involvement for liability in this suit.   See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995); Dunn v. Stewart, 2012 WL 6963923, *5 (N.D.W.Va. 2012); Sanders v. O'Brien, 2011 WL 2972089, *10 (N.D.W.Va. 2011); DeBerry v. Gilmer, 2010 WL 3937956, *6 (N.D.W.Va. 2010). Accordingly,

Defendants Williams and Eichenlaub should be dismissed.

3. **Defendants James Nolte and Joshua Hall**

In his complaint, Plaintiff alleges that James Nolte is a Nurse Practitioner and Joshua Hall is a Registered Nurse for the Medical Department at FCI Gilmer. Beyond naming James Nolte as a defendant, the Plaintiff does not refer to his specifically in any of claims. However, the Plaintiff alleges that Joshua Hall violated his Eighth Amendment rights with respect to treatment of his TB and his deteriorating eye condition.

Title 42 U.S.C. § 233(a) makes the FTCA the exclusive remedy for specified actions against members of the Public Health Service ("PHS"). In particular, it protects commissioned officers or employees of the PHS from liability for "personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions" by requiring that such lawsuits be brought against the United States instead. The United States thus, in effect, insures designated public health officials by standing in their place financially when they are sued for the performance of their medical duties. Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000). See also, US v. Smith, 499 U.S. 160, 170 n. 11 (1990) (42 U.S.C. § 233 is one of several statutes passed to provide absolute immunity from suit for Government medical personnel for alleged malpractice committed within the scope of employment); Carlson v. Green, 446 U.S. 14, 20 (1980) (Congress explicitly provides in 42 U.S.C.§ 223(a) that the FTCA is a plaintiff's sole remedy against PHS employees); Apple v. Jewish Hospital and Medical Center, 570 F. Supp. 1320 (E.D.N.Y. 1983) (Motion for dismissal of the action against the defendant doctor, a member of the National Health Corps. granted and the United States substituted as defendant, and case deemed a tort action).

Therefore, pursuant to 42 U.S.C. § 233(a), Congress made proceedings under the FTCA the sole avenue to seek relief against any PHS employee for injuries resulting from the employee's performance of medical functions within the scope of his or her employment. The Supreme Court confirmed this rule in Hui v. Castaneda, by specifically holding that the immunity provided by §233(a) precludes a Bivens action against individual PHS officers or employees for harms arising out of constitutional violations committed while acting within the scope of their office or employment. Hui, 559 U.S. 799, 802 (2010).

Defendant Jim Nolte is a Nurse Practitioner and a Commissioned Officer in the PHS. ECF No. 36-5 at 2. Joshua Hall is a Registered Nurse and a Commissioned Officer in the PHS. ECF No. 36-6 at 2. Thus, pursuant to 42 U.S.C. § 233(a), Defendants Nolte and Hall are entitled to absolute immunity from suit for all claims arising from the medical care each provided to Plaintiff, and should be dismissed from Plaintiff's lawsuit.

4.      **Defendant's Claim of Deliberate Indifference**

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990), <u>cert.denied</u>, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[9]

---

[9] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. <u>Webb v. Prison Health Services</u>, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. <u>Veloz v. New York</u>, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. <u>Brice v. Virginia Beach Correctional Center</u>, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. <u>Browning v. Snead</u>, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. <u>Finley v. Trent</u>, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. <u>Johnson v. Quinones</u>, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. <u>Clinkscales v. Pamlico Correctional Facility Med. Dep't.</u>, 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. <u>Harrison v. Barkley</u>, 219 F.3d 132, 137 (2d Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the <u>Estelle</u> standard. <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 - 703 (2d Cir. 1998). A degenerative hip a serious condition. <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 67 (2d Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. <u>Loe v. Armistead</u>, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. <u>Giambalvo v. Sommer</u>, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. <u>See</u>, e.g., <u>Lepper v. Nguyen</u>, 368 F. App'x. 35, 39 (11th Cir. 2010); <u>Andrews v. Hanks</u>, 50 Fed. Appx. 766, 769 (7th Cir. 2002); <u>Bryan v. Endell</u>, 141 F.3d 1290, 1291 (8th Cir. 1998); <u>Beaman v. Unger</u>, 838 F.Supp.2d 108, 110 (W.D. N.Y. 2011); <u>Thompson v. Shutt</u>, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); <u>Mantigal v. Cate</u>, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) *report and recommendation adopted,* 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); <u>Johnson v. Adams</u>, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); <u>Bragg v. Tyler</u>, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); <u>Vining v. Department of Correction</u>, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference.  <u>Wilson</u>, 501 U.S. at 303.   A finding of deliberate indifference requires more than a showing of negligence. <u>Farmer v. Brennan</u>, 511 U.S.  825, 835 (1994).  A prison official "must both be aware of facts from which the inference could be  drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Id.</u> at 837.  A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that  the risk to which the fact gave rise was insubstantial or nonexistent."  <u>Id</u>. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a  serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."   <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist.  <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment,  conditions which obviously require medical attention, conditions which significantly affect an  individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health."  <u>See</u> <u>Morales Feliciano v. Calderon Serra</u>,

---

serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. <u>Cokely v. Townley</u>, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

In the instant case, the Plaintiff's claim of deliberate indifference is two-fold. First, the Plaintiff alleges that his Eighth Amendment right to medical care was violated when he arrived at FCI Gilmer on February 27, 2009, and was not screened for TB. In response to the Defendants' Motion to Dismiss or for Summary Judgment, the Plaintiff clarifies his position that the failure to screen him upon his arrival is merely an example of a common procedure not to screen entering prisoners. ECF No. 45 at 9. The Plaintiff argues that it was this common procedure which caused a prisoner with TB to enter the general population and led to his being infected.

Clearly, TB is a serious condition. However, the Plaintiff's allegation regarding failure to screen fails to establish the subjective prong of deliberate indifference. First, it clear from the exhibits that medical personnel at FCI Gilmer were following BOP policy by not screening him. As noted by Dr. Mace-Leibson in her Declaration, inmates in the custody of the BOP are ordinarily screened with tuberculin skin tests every twelve months, and a prisoner's transfer from one facility to another does not warrant an updated screening as long as the prisoner remains in federal custody during the transfer. The Plaintiff arrived at FCI Gilmer on February 27, 2009, as a transfer from another BOP facility. His last PPD screening was conducted on December 31, 2008, just two months earlier, and was negative. Moreover, less than two months later, he was administered a PPD, when he was removed from FCI Gilmer on a writ, and the results were negative as were the results of a chest x-ray. ECF No. 36-2 at 28. Therefore, the failure to administer a PPD test on the Plaintiff when he arrived at FCI

Gilmer would not have made any difference to his eventual exposure to TB. In addition, the Plaintiff's allegation that failure to routinely administer PPD tests to incoming inmates allowed an inmate with TB to enter the general population is an allegation without any support. The incubation period from infection to development of a positive TB skin test reaction is approximately 2 to 12 weeks.[10] Therefore, there is no guarantee that testing any prisoner upon entry to a facility will negate the possibility of an infected inmate entering the general population, and the failure to test every inmate each time he is transferred to another BOP facility clearly falls short of deliberate indifference.

The Plaintiff's second allegation is that once diagnosed with TB, his treatment was inadequate and contributed to his eye impairment. The Defendants' memorandum in support of its Motion to Dismiss or for Summary Judgment fails to address this claim. This Court assumes that this failure was based on the Defendant's anticipation that the complaint would be dismissed as untimely. However, the medical records and responses to administrative grievances that have been supplied give pause for some concern.

First, it is not clear that any AFB culture of Plaintiff's sputum ever returned as positive. Second, although a CT scan was done on November 23, 2009, without contrast and was to be repeated with contrast, there is no record that the repeat scan was ever performed. Third, although there is no evidence that the Plaintiff suffered from a resistant form of TB, it appears that he was prescribed medications based on the resistant culture of another inmate. The Plaintiff alleges that three of those

---

[10] See www.medicinet.com and www.vanderbilt.edu.

medications had side effects that are consistent with vision impairment. Fourth, although the Plaintiff was approved for referral to a retinal specialist, who recommended on April 7, 2010, that various labs be run, there is no indication that those lab tests were ever performed, and although the specialist recommended surgery, nearly two years later, on January 18, 2012, the same retinal specialist noted that the "prison had delayed this for reasons unknown." ECF No. 45-12 at 2. Although retinal attachment to the right eye was eventually performed on March 7, 2012 [ECF No. 36-1 at 16], there are no medical records available from which this Court can determine whether the delay had a negative impact on the Plaintiff's surgical outcome. It also appears that the Plaintiff underwent further eye surgery on November 17, 2013 [ECF No. 36-1 at 26], there are no medical records explaining why this surgery was performed or what the outcome of the surgery was.

This Court recognizes that the Defendant's may be able to establish that there were medically sound reasons for the course of treatment prescribed for the Plaintiff and for the delay in the  recommended surgery. However, an adequate review of the Plaintiff's allegations as this time is impossible.

Accordingly, for the foregoing reasons, the undersigned **RECOMMENDS** that the Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment [ECF No. 35] **be GRANTED in part and DENIED in part.**  The undersigned further **RECOMMENDS** that the Plaintiff's Complaint [ECF No. 1] be **DISMISSED with PREJUDICE** with respect to Defendants C. Williams; C. Eichenlaub; James Nolte and Joshua Hall. Finally, the undersigned **RECOMMENDS** that the Plaintiff be permitted to amend his complaint to add Eddie Anderson, DO as a named Defendant, that a summons

thereafter be issued, and Defendants Mace-Leibson and Anderson be directed to respond to the Plaintiff's allegations regarding his medical care following his positive PPD.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objections are made and the basis for such objections. A copy of any objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record by electronic means.

DATED: January 24, 2017


*/s Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE