IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

**MELVIN GIVENS,**

**Plaintiff,**

**v.**                                                                      **Civil Action No. 1:15cv111**
                                                                            **(Judge Keeley)**

**EDDIE ANDERSON,**

**Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural Background

On July 2, 2015, the *pro se* Plaintiff, Melvin Givens, filed a civil rights case against a number of Defendants alleging a violation of his Eighth Amendment rights. ECF No.1. The complaint brought suit against the Defendants in their individual capacities pursuant to <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971). On June 7, 2016, the Defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment. ECF No. 35. On January 24, 2017, Magistrate Judge Michael John Aloi filed a Report and Recommendation in which he recommended that the complaint be dismissed against all the named Defendants, but that the Plaintiff be permitted to amend his complaint to add Eddie Anderson, D.O. as a Defendant. ECF No. 51. On March 29, 2017, the Honorable Irene M. Keeley, United States District Judge, entered an Order which adopted in part and denied in part the Report and Recommendation. ECF No. 59. More specifically, the Order dismissed the Plaintiff's complaint with prejudice against all the Defendants except RN Hall and granted the

Plaintiff's motion to amend his complaint by adding Dr. Anderson as a Defendant. The Order further directed the Plaintiff to file an amended complaint against Dr. Anderson and RN Hall by May 15, 2017.

On May 18, 2017, the Plaintiff filed his amended complaint against Dr. Anderson but failed to make any allegations against RN Hall[1]. ECF No. 61. On June 30, 2017, an Order to Answer was entered, and a 60 day summons was issued for Dr. Anderson. ECF Nos. 64, 65. On September 13, 2017, Dr. Anderson filed a Motion to Dismiss or in the alternative, for Summary Judgment. ECF No. 73. On September 14, 2017, a Roseboro Notice was issued. ECF No. 75. On November 8, 2017, the Plaintiff filed a response. ECF No. 83. On January 9, 2018, the undersigned Magistrate Judge[2], issued an Order directing the Defendant to file a supplemental declaration and additional medical records. ECF No. 89. On January 31, 2018, the Defendant filed his response to the order. ECF No. 93. On February 2, 2018, the undersigned entered an order for clarification of certain medical records [ECF No. 95], and the Defendant filed his response on February 8, 2018. ECF No. 96.

## II. Factual History

The undersigned begins by noting that the record before the court contains more than 700 pages of medical records dating from February 2009, when the

---

[1] On June 1, 2017, Joshua Hall filed a Motion to Dismiss the amended complaint. ECF No. 63. After noting that the amended complaint listed only Dr. Anderson as a defendant in both the case caption and the body, Joshua Hall requested the he be removed from the docket as a defendant. The Plaintiff did not object to this motion nor did he include any reference to Joshua Hall in the pleadings that he filed after amending his complaint. Accordingly, on January 4, 2018, the Court granted Joshua Hall's Motion to Dismiss the Amended Complaint, and he was removed as a defendant in the case. ECF No. 86.

[2] On September 15, 2017, this matter was transferred to the undersigned, and Magistrate Judge Aloi was no longer assigned to the case.

Plaintiff arrived at FCI Gilmer through August 3, 2017. Much of the records have no particular significance to the substance of the Plaintiff's complaint which is that a two-year delay, from April 7, 2010, when the WVU Eye Institute first recommended treatment with possible laser photocoagulation until he underwent eye surgery on February 27, 2012, resulted in the loss of vision in his right eye.[3] Accordingly, the undersigned will limit his review of the medical records to those dealing with the Plaintiff's treatment for his eye condition.

On January 22, 2010, the Plaintiff was evaluated by optometry and found to have branch vein occlusion and significant vascular scarring of the right eye, with mild periphery of the left eye also. He was then referred to a retinal specialist. ECF No. 36-3 at 16.

On April 7, 2010, the Plaintiff was seen at the WVU Department of Ophthalmology upon referral for evaluation of his right retina due to vision changes over the last two months. On dilated fundus exam, he was found to have several areas of tractional retinal detachments and vitreoretinal traction in the mid-periphery. On fluorescein angiography, the right retina did show multiple areas of tractional retinal detachments, attenuated blood vessels, hard exudates and areas of non-perfusion. Based on this examination, the examining ophthalmologists stated that "[o]ur impression is that he has a retinopathy process with the differential being sickle cell retinopathy, cytomegalovirus, herpes simplex virus, varicella zoster virus. There is also the possibility that this could be related to posterior uveitis." ECF No. 36-3 at 28. Accordingly, it was recommended that medical staff at FCI Gilmer check labs for

---

[3] A large portion of the medical records detail the fact that the Plaintiff suffers from hypertension and tends to establish that he fails to follow medical directives aimed at controlling his blood pressure. In addition, some of the medical records chronicle his treatment for tuberculosis.

sickle cell electrophoresis, HIV, CMV, HSV, and VZV. They also recommended treating him with possible laser photocoagulation. In conclusion, they noted that they had "made an appointment for follow up after your completion of his lab work and have sent lab orders with the guards." Id.

On April 9, 2010, an administrative note was entered by Dr. Mace-Leibson following the ophthalmology consultation performed on April 7, 2010, at the West Virginia University Eye Institute. The diagnosis was listed as retinopathy and tractional retinal detachments of the right eye, and the treatment was listed as laser therapy of the right eye. With respect to the lab testing recommended by WVU, Dr. Mace-Leibson noted that that the Plaintiff had already been screened for HIV and RPR[4]. It appears she then ordered laboratory tests and a patient history for cytomegalovirus, varicella, herpes simplex virus and zoster virus. ECF No. 36-3 at 26.

On April 23, 2010, Dr. Mace-Leibson noted possible exposure to syphilis indicated by lab workup and further testing was ordered. ECF No. 74-2 at 13.

On April 26, 2010, Dr. Mace-Leibson made an administrative note that Plaintiff had completed 120 doses of the recommended multi-drug treatment regimen prophylaxis for TB exposure and was being discontinued.[5] ECF No. 36-3 at 30.

On June 8, 2010, the Plaintiff was seen by the remaining Defendant, Eddie Anderson, DO in the chronic care clinic for a chief complaint of hypertension. He was assessed as having benign essential hypertension which was not improved. He was

---

[4] The rapid plasma regain (RPR), RPR titer, or RPR test refers to a type of rapid diagnostic test that looks for non-specific antibodies in the blood of a patient that may indicate a syphilis infection.

[5] This Court notes that in his original complaint, the Plaintiff alleged that he was exposed to TB at FCI Gilmer which caused him to have a detached retina and permanent vision loss.

advised that he needed to consider blood pressure medication, and it was noted that he understood the risk to his eyes, heart, kidneys, brain, etc. due to his high blood pressure. A new consultation request for ophthalmology was made to obtain laser intervention. ECF No. 74-2 at 8-11.

On June 22, 2010, the ophthalmology consultation for the laser treatment was approved, and the Plaintiff was so notified. ECF No. 74-2 at 7.  On August 23, 2010, the Plaintiff was seen at the West Virginia University Eye Institute. There is no corresponding FCI Gilmer medical record indicating a return trip encounter and no indication that Dr. Anderson received anything from WVU ophthalmology until January 31, 2011, when a two page medical note was scanned into the BEMR system[6]. ECF No. 74-1 at 3. The notes prepared by WVU indicate that the Plaintiff's vision was unchanged from the April visit, and they were informed by the Plaintiff that his lab results were so far negative. The impression was suspected infectious etiology/pending lab work up. ECF No. 74-2 at 64-65.

On November 30, 2010, Dr. Mace Leibson entered an administrative note that a utilization review request for optometry consultation was approved, and the Plaintiff would be scheduled for this consultation. ECF No. 36-3 at 43. Dr. Mace-Leibson did not address this note in her Declaration, and it is unclear whether this was actually a new consultation request for ophthalmology, a redundant note regarding the June 22, 2010, approval, or simply a request for an optometric consult as opposed to an ophthalmological consult.

_____

[6] The BOP's Bureau Electronic Medical Records System ("BEMR") provides for the collection, storage, maintenance analysis and dissemination of comprehensive medical records for more than 200,000 offenders remanded for federal custody. The system overall includes an inmate's medical, social, and psychological history and ongoing data and related informational records. See https://www.bop.gov/foia/bemr.pdf.

On October 31, 2011, routine evaluation by a contract optometrist summarized the course of the Plaintiff's vision and consultations. It was noted that the Plaintiff was sent to WVU, and they wanted to do laser surgery on his right eye pending blood workups to rule out infectious causes. The Plaintiff told the contract optometrist that the testing was done but the surgery was not approved and his vision was worse. A recommendation was made to refer back to ophthalmology for treatment and if blood work had not been done to complete it immediately to see if treatment was still viable. The contract optometrist also indicated that she was a bit concerned with the Plaintiff's left eye for a start of retinoschisis at the far aspect of the retina, and that now was the only eye he sees with. She indicated she wanted him referred back to WVU, and she made a consultation request the same day. ECF No. 74-3 at 45-49.

The next day, on November 1, 2011, Dr. Anderson entered the following administrative note: "Reviewed, preliminary lab results only noted, asked lab for definitive results from 4/2010. Will approve opth follow up and fax results once obtained." ECF No. 74-3 at 44.

On November 21, 2011, the Plaintiff was evaluated by a mid-level provider, and the chief complaint documented "34 [year old] African American male presents scheduled for a follow-up appointment. He states that he had a torn retina at beginning of 2010 and was suppose [sic] to go see the eye doctors at WVU but has not  [been] yet. [Patient] states that his vision has not changed but it is very blurry and difficult to see. [Patient] states he has not been taking his blood pressure medication because he didn't [realize] he had to go get it from the pharmacy. He states that he will take it now though. [Patient] agrees and understands diagnosis treatment plan

and risks." ECF No. 74-3 at 41. Medications were renewed and a note was made to research the status of the WVU ophthalmology follow-up. Id. at 41-43.

On January 18, 2012, the Plaintiff was evaluated at the requested WVU ophthalmology consultation. The diagnosis was retinal detachment, tractional, right eye. The plan was to perform surgical repair under general anesthesia. The note also indicated he was previously scheduled for surgery and "the prison delayed this for reasons unknown." ECF No. 74-3 at 116-123.

On February 2, 2012, and ophthalmology consultation for follow-up of retinal detachment was requested. On February 3, 2012, Dr. Anderson made an administrative note for pre-op testing request for the upcoming surgery. ECF No. 74-3 at 21-22.

On February 6, 2012, Dr. Anderson reviewed and counseled the Plaintiff for pre-operative evaluation. During this encounter, the Plaintiff was noted to have uncontrolled hypertension. A recommendation was made for aggressive hypertension control and follow-up as recommended by ophthalmology. ECF No. 74-3 at 20.

On February 27, 2012, the Plaintiff underwent eye surgery at the Ruby Day Surgery Center at WVU. He returned to the institution on the same day, where nursing made an entry documenting the medical trip returned from an ophthalmology procedure with a recommendation for next day follow-up with ophthalmology. ECF No. 74-3 at 101, 109-111. On February 28, 2012, nursing made an entry documenting a medical return trip from ophthalmology and entered the discharge medications. Id. at 13-18.

On March 6, 2012, a mid-level practitioner evaluated the Plaintiff for a sinus

infection but noted as well, "Inmate is also a status post eye surgery for detached retina he states that he is doing well concerning this issue he states he is scheduled for [outpatient] follow-up with ophthalmologist. ECF No. 74-3 at 8-12.

On March 7, 2012, the Plaintiff had a follow-up with WVU, and it was noted he was doing well. A mid-level practitioner evaluated the Plaintiff on his return from WVU and noted, "[patient] presents to the clinic today unscheduled for a med trip follow-up. He states that he went out today for a follow-up for the eye [surgery] he had yesterday. He states that the physician he saw said that everything looked good. He states that he was told he needs a follow-up in one month to determine if he can get the gel removed from his eye. The physician stated that if it was not ready to be removed then he would need to return in 3 months." ECF No. 74-3 at 5-7, 92-97.

On March 9, 2012, Dr. Anderson noted only prescriptions were received from the February 2012 eye surgery and that there was no report or recommended follow-up. A prescription was written and follow-up with ophthalmology was requested. ECF No. 74-3 at 2-4.

The ophthalmology consult was approved on April 17, 2012, and the Plaintiff had that consultation with WVU on May 2, 2012. It was recommended that he return after three months. ECF No. 74-3 at 34, 94-96.

On August 14, 2012, August 21, 2012, and September 4, 2012, a contract physician evaluated the Plaintiff for uncontrolled hypertension and sinusitis. The physician noted that ophthalmology follow-up needed to be expedited, as it had been three months and the follow up visit was due. Routine hypertension and acute sinusitis orders were entered. Counseling was performed again because of

medication non-compliance. ECF No. 73-4 at 18-28.

On September 25, 2012, the Plaintiff had the ophthalmology follow-up at WVU. Notes indicate his successful retinal reattachment with some peripheral tractional retinal detachment that is not encroaching on the macula and recommended a six-month follow-up appointment. ECF No. 74-5 at 154-157.

On July 8, 2013, Dr. Anderson evaluated the Plaintiff in a chronic care encounter for his hypertension. The Plaintiff stated that he had "oil" placed in his eye after his surgical intervention, but was not seen in January 2013 for follow-up because it was a wrong date. Dr. Anderson noted that the Plaintiff's blood pressure was right on the border, and he suspected noncompliance with medications. Dr. Anderson encouraged the Plaintiff to comply with medications and to make lifestyle changes. He also noted that he would inquire about the ophthalmology consultation. Routine labs were pending. ECF No. 74-5 at 42-45.

The Plaintiff was evaluated on a follow-up with WVU on September 13, 2013. They indicated his complaint was that his [right eye] had been getting stuck and [his left eye] felt itchy and had sand in it. Assessment was retinal detachment, tractional, right eye, myopia; PSC (posterior sub-scapular cataract). The plan was "Old tractional retinal detachment [right eye]-Under [silicone oil], macula is flat with peripheral [tractional retinal detachment]. Plan to leave under oil for now; may likely detach with removal 2.[Posterior subcapsular right eye]  surgery unlikely to improve vision. Follow-up in 6 months." ECF No. 74-5 at 141-145.

On September 16, 2013, a nursing encounter noted the Plaintiff had just returned from the ophthalmology visit. On the same day, Dr. Anderson made a

request for ophthalmology follow-up. ECF No. 74-5 at 37-39.

On November 8, 2013, the Plaintiff was examined by nursing staff after he indicated it felt like something exploded in his right eye about 15 minutes earlier. Assessment noted only [sclera][7] to right eye was reddened. It was noted that the Plaintiff was not taking his blood pressure medication and his BP was 161/102. A mid-level provider decided to send the Plaintiff to WVU for further evaluation. Notes from WVU indicated that he had acute closed-angle glaucoma and was treated with medication and discharged after eye pressure reduced. ECF No. 74-5 at 31, 32, 109, 128.

On November 10, 2013, the Plaintiff returned to FCI from the WVU. He reported no pain at that time. It was noted the Plaintiff was instructed not to lift anything heavy and his ER[8] medications were prescribed. ECF No. 75-5 at 26.

On November 12, 2013, Dr. Anderson made an administrative note that the WVU ophthalmology doctor had called and indicated that the Plaintiff need to be seen that week for his follow-up appointment. Dr. Anderson submitted the urgent ophthalmology follow-up consultation. ECF No. 74-5 24.

The Plaintiff was sent to and examined by WVU on November 14, 2013. The Plaintiff indicated to WVU that he was having pressure behind his left eye and was supposed to have immediate surgery on his left eye. WVU indicated that his principal problem was phacomorphic glaucoma. He was also noted to have acute angle-

---

[7] The sclera is the white part of the eye that surrounds the cornea. The sclera forms more than 80% of the surface of the eyeball, extending from the cornea all the way to the optic nerve, which exists in the back of the eye. Https://www.allaboutvision.com/resources/sclera.htm

[8] The records indicate that the Plaintiff was seen at Ruby (WVU) Emergency Department and not at the Eye Institute. ECF No. 74-5 at 128.

closure glaucoma of the right of eye and a history of retinal detachment, tractional, of right. They indicated the plan was "episode of angle closureOD/sp PPV/SO-IOP control today on all [drops]. Hasn't taken Diamox, okay for now. Narrow angle with phacomorphic component. Will [follow-up] Miller clinic next [Friday] for pre-op. May benefit from PI[9]. He was instructed to begin taking moxifloxacin (VIGAMOX) 0.5%, one drop in the right eye four times a day and prednisolone ancetate (PRED FORTE) 1% ophthalmic Drops, Suspension 1 drop in both eyes every four hours while awake. He was also instructed to discontinue DIAMOX SEQUELS, ALPHAFAN P, TRUSOPT and TIMOPTIC. ECF No. 74-5 at 103-04.

On November 16, 2013, the Plaintiff reported to medical indicating that his right eye was again having a lot of pressure and he could not see out of it. He indicated to nursing staff that it had started the evening before. The Plaintiff was sent out for evaluation. ECF No. 74-5 at 20-22.

Notes from WVU indicate that on November 17, 2013, the Plaintiff was "admitted for intractable elevation of [intraocular pressure] secondary to phacomorphic angle closure glaucoma. He underwent [pars plana vitrectomy] with silicone oil removal and complex cataract extraction without intraocular lens [] and had an appropriate postoperative appearance on day 1."  It was noted he would be discharged with medications and returned for a follow-up in one week. ECF No. 74-5 at 105-113.  A November 18, 2013, notation in the WVU medical record indicated he was doing well and had only mild irritation in his right eye overnight and no pain. Id.

---

[9] Peripheral iridectomy is a surgical procedure in which a whole is made in the periphery (outer part) of the iris by removing a full-thickness piece from the iris in order to treat a specific type of glaucoma called narrow-angle glaucoma (or angle-closure glaucoma). https://www.medicinenet.com/script/main/art.asp?articlekey=22368

On November 18, 2013, a medical note was entered indicating the Plaintiff had returned from the WVU Eye Institute and had a follow-up appointment scheduled. His instructions were to wear an eye shield at bedtime for one week, no rubbing eye, he could shower as long as water did not get in the eye, and no heavy lifting. Two new eye drops were given to him by the hospital. ECF No. 74-5 at 16.

On November 19, 2013, Dr. Anderson noted paperwork was pending from WVU, and he made a follow-up ophthalmology requests. ECF No. 74-5 at 15.

On December 4, 2013, Dr. Anderson noted that he had reviewed the Plaintiff's most recent ophthalmology discharge instructions and medication orders were adjusted. ECF No. 74-5 at 7.

On December 9, 2013, the Plaintiff had a post-op follow-up visit with WVU. His previous procedures were noted and his vision was no better at that time, but he had no pain. The plan portion of the note indicated the Plaintiff was "Doing well" and he would follow up in two months. ECF No. 74-5 at 114-118.

On January 9, 2014, Dr. Anderson entered a note indicating that he had reviewed the ophthalmology report and prescribed the new recommended medication for his eye. ECF No. 74-5 at 2.

On February 20, 2014, the Plaintiff was seen at WVU for follow-up. His vision was no better, and he had no pain. It was noted he would have a follow-up in two months for possible secondary lens insertion. ECF No. 74-6 at 137-140.

On May 23, 2014, the Plaintiff was examined by Dr. Savidge, another physician at FCI Gilmer. It was noted that the Plaintiff was complying with medications and the only current problem was his decreased vision in his right eye status post-retinal

surgery, and he was pending a follow-up. It was noted his medications were renewed, his next visit was scheduled, and his lipids would be rechecked with diet and exercise before considering more prescriptions. It was also noted that he was overdue for an optometry/ophthalmology follow-up and priority scheduling was requested. ECF No. 74-6 at 35-38. On June 1, 2014, Dr. Savidge entered an administrative note indicating the ophthalmology recommendations were scanned into the record. ECF No. 74-6 at 35-38.

On June 2, 2014, a mid-level provider entered a note requesting another follow-up ophthalmology consultation for re-insertion of lens. ECF No. 74-6 at 32. On August 11, 2014, Dr. Savidge indicated that FCI Gilmer had just received the December 2013 ophthalmology document and that a follow-up was already scheduled. ECF No. 74-6 at 31.

On October 28, 2014, the Plaintiff was examined by WVU ophthalmology. It was noted he had decreased vision in both eyes. Notes indicate he was there for evaluation of possible [intraocular lens] for right eye. Surgery was recommended, but no follow-up date was entered. ECF No. 74-6, at 118-120.

On October 28, 2014, a return medical note was entered by FCI Gilmer after his WVU ophthalmology trip. The Plaintiff reported that they were going to do a lens replacement. ECF No. 74-6 at 27.

The Plaintiff was examined by a mid-level provider on November 17, 2014, for his hypertension. The Plaintiff again declined to start cholesterol medication. It was noted that the Plaintiff had been seen by WVU but WVU did not put a time they would like a follow-up. The mid-level provider indicated she requested the scheduler to find

out before she put in the request. ECF No. 74-6 at 22.

On December 8, 2014, the Plaintiff went to WVU for right eye surgery for implementation of sulcus [Intraocular Lens] and posterior synechialysis. ECF No. 74-6 at 92-109.

On December 9, 2014, a WVU note states that the Plaintiff was examined for follow-up after having surgery the day before for intraocular lens of the right eye. It was noted the wound was well closed. ECF No. 73-6 at 88-90. On December 9, 2014, a medical return trip was entered at FCI Gilmer, and the Plaintiff reported having the surgery to his right eye at WVU the previous day. He also indicated he had returned to WVU December 9, 2014, for a post op follow-up. ECF No. 74-6 at 18-19.

The Plaintiff was examined by WVU ophthalmology on December 16, 2014, for post op follow-up. The Plaintiff had no pain and no improved vision. It was noted he was doing well post cataract extraction with intraocular lens of the right eye. ECF No. 74-6 at 84-87. On December 16, 2014, a medical note was entered and the Plaintiff reported he was returning from a WVU ophthalmology follow-up. He indicated that he was told by WVU that everything looked good. ECF No. 74-6 at 14. The Plaintiff was examined by mid-level provider on December 19, 2014, for chronic care related to his hypertension. That same day the mid-level provider reviewed the December 8, 2014, ophthalmology consult and also submitted a request for a follow-up. ECF No. 74-6 at 12-13.

On January 16, 2015, the Plaintiff was examined by an optometrist at the institution. The Plaintiff reported his history of retinal detachment surgery in 2012, two attacks of angle closure glaucoma in 2013, a cataract removed in 2013 without an

implant given, and stated that in December 2014, he had an implant put in. The Plaintiff reported he had not returned for a 10 week follow-up yet. The optometrist indicated that he was requesting that WVU assess the Plaintiff's left eye when they do the 10 week checkup. He indicated he saw no need for the Plaintiff to be seen by WVU any sooner than that as the surgical site seem to be "quiet and well healed." He was concerned the other eye had a possible loss of acuity. He wanted WVU to determine if the macula and optic nerve head were healthy. The optometrist indicated the Plaintiff had been told that he had a dense cataract in his left eye, and he was told to wait as long as possible to have surgery because, if unsuccessful, he could lose vision in the left eye. The optometrist indicated that "the [optic nerve head] in his [left side] needs evaluated for any neovascularization… it looks slightly suspicious… since this is now his only good eye, I am stressing to not have this overlooked when he goes back to WVU…" ECF No. 74-6 at 6-9. An ophthalmology consult was requested at that time due to cataracts in the left eye and the retinal detachment in the right eye. ECF No. 74-6 at 8. An administrative note by a mid-level provider on January 22, 2015, requested the 10 week follow-up with WVU. ECF No. 74-6 at 5.

On March 10, 2015, the Plaintiff was examined by WVU ophthalmology. It was noted he was doing well since his surgery on his right side. The left eye was noted to have a mild cataract and they would just monitor. ECF No. 74-7 at 128-131. A medical trip return encounter was entered on March 10, 2015, from the WVU follow-up. ECF No. 74-6 at 2-3.

On April 30, 2015, Dr. Anderson examined the Plaintiff in the chronic care clinic for hypertension. The Plaintiff indicated he had not been taking his medication in

anticipation of additional eye surgery. Dr. Anderson renewed his medications and requested an ophthalmology consultation. He noted that the Plaintiff had an ongoing eye issues and was seen in early 2015, and told to hold [aspirin] and [Ace inhibitors] in anticipation of laser surgery. Dr. Anderson noted there was no record of that encounter and that he would request a record for consultation review. He advised the Plaintiff to follow ophthalmology recommendations until they could get the records. ECF No. 74-7 at 41-44.

On May 8, 2015, an administrative note was entered by Dr. Savage. It was noted a July optometry recheck would be scheduled in lieu of an outside ophthalmology referral, but an ophthalmology consultation would be reconsidered if indicated by the optometry evaluation. It was noted that the Plaintiff had already been seen by ophthalmology for a one day, one week, and three-month post op follow-up. ECF No. 74-7 at 40.

On May 22, 2015, the Plaintiff met with the contract optometrist and had some questions. The optometrist noted the Plaintiff's history was complicated. The optometrist indicated that the Plaintiff just wanted a transition tint and that WVU said he needed that. The optometrist could not find any indication that WVU had recommended transition lenses. The optometrists noted that when the Plaintiff was told this, he indicated he had to go to work and had no more questions for the doctor. The optometrist indicated that he wanted to check the Plaintiff's vision in the glasses made for him that day, but the Plaintiff refused and stated he had to go. The optometrist indicated he was still concerned about the vision in the Plaintiff's left eye and had requested WVU look at it, but they had not. The optometrist indicated that he

also wanted to perform refraction because WVU's prescription was much different than his. However, the Plaintiff said he could see good out of the [optometrist's] prescription and wanted to go back to work. The optometrist requested a consultation with ophthalmology to rule out neovascularization in the Plaintiff's left eye. He indicated that he had previously requested this but he did not think WVU received his request or records as they only checked his right eye. ECF No. 74-7 at 36-38.

On July 2, 2015, Dr. Savidge requested an ophthalmology consultation based upon the contract optometrist's request. ECF No. 74-7 at 35.

On August 6, 2015, Dr. Anderson entered an administrative note showing an upcoming follow-up with ophthalmology. ECF No. 74-7 at 31.

The Plaintiff went to WVU ophthalmology on August 10, 2015, and had a vitrectomy on the right side. It was noted the following day that he was doing well. ECF No. 74-7 at 106-111. A medical trip return was entered on August 11, 2015, by nursing staff after the Plaintiff had eye surgery the day before. Medications were ordered as requested ECF 74-7 at 27-28.

On August 18, 2015, the Plaintiff was examined by WVU on a follow-up. It was noted he was doing well one week past vitrectomy of the right eye. The lens was in good position and the pressure was normal. The Plaintiff's vision was reported as better, but still not good. ECF No. 74-7 at 101.

On September 16, 2015, the contract optometrist examined the Plaintiff again at FCI Gilmer. The optometrist noted the Plaintiff's long history, and that he lacked medical records from WVU. The optometrist noted the Plaintiff was being seen because the Plaintiff was put on three different eye drops after laser treatment, and

the optometrist noted that this was not normally done, and he would like to see the WVU notes. It was noted transition lenses would be good for the Plaintiff to keep down the glare off his one good eye. The optometrist noted the right eye was well healed, and his left eye had a cataract that he hoped WVU looked at during their evaluation as his vision in that eye had decreased slightly. It was noted the current visit was to see if there was any inflammation continuing, and there was not. It was noted that his left prescription "was a terrible subjective. He was all over the place." ECF No. 74-7 at 17-18.

On October 26, 2015, the Plaintiff was examined for his hypertension in the chronic care clinic. A mid-level provider noted that the Plaintiff stated he had been complying with medications and had no issues. It was also noted that the Plaintiff indicated he had a [vitrectomy] but had not taken all of his eye drops because he was not given them in the special housing unit, but took them for a week after he was released. He claimed he had a neck infection because he had not taken the drops. The mid-level provider assured the Plaintiff that not taking eye drops would not affect his neck. It was noted his neck was enlarged on the left side, and he was prescribed Fluticasone Propionate Spray. The Plaintiff was instructed to follow up with sick call as needed. ECF No. 74-7 at 14.

The Plaintiff was examined by WVU ophthalmology on November 24, 2015, for a follow-up. It was noted that "MD additions to HPI Vision is fine in the left eye There was some concern in the prison for [neovascularization of the disc ("NVD") in the left eye]." The assessment was uveitis in the left eye. No NVD or [neovascularization elsewhere ("NVE")]  in the left eye was noted. They indicated that he had NVE in the

right eye in sea fan configuration that led to [retinal detachment] in [the left eye]. Subsequent [cataract extraction with intraocular lens] and [membrane peeling] without improvement in his vision. Workup at the time was negative for Sickle-cell, Saracoid, Syphilis, HIV, etc. Now with a rare cell in the left eye and hyperemia of the disc." They recommended evaluation by another WVU doctor. ECF No. 74-7 at 89. A return medical trip was noted by a mid-level provider on November 24, 2015, from the ophthalmology visit. It was documented that he had already been taking the prescribed prednisolone drops. No other instructions were provided ECF No. 74-7 at 11.

On December 11, 2015, Dr. Anderson made an administrative note and a request for an ophthalmology consultation for uveitis. ECF No. 74-7 at 10

On February 11, 2016, the Plaintiff was examined at the WVU Eye Institute by the previously recommended doctor. The Plaintiff's history was discussed with a still unknown etiology that could have been occlusive vasculitis or localized vascular occlusion. The summary also indicated his surgical history and noted he was stable clinically from the retina standpoint with a guarded visual prognosis with no inflammation except + ½ vitreous cells in that eye. A differential diagnosis was listed as "Syphilis, TB, sarcoidosis, idiopathic, Bechet Disease Infectious disease consult order today given possible history of syphilis (denies receiving any treatment for it so far) and TB exposure and treatment in the past." Follow-up in three weeks was recommended. ECF No. 74-7 at 84-85.

On February 24, 2016, the Plaintiff was seen by the contract optometrist, but refused to be examined as requested. The optometrist summarized the Plaintiff's

history as follows:

> Long drawn out history… Quick summary…
>
> Right eye: Retinal detachment which left eye scarred in 2012/aphakic and later did Additional surgery for an implant in the eyes/laser was done later which may have been [Yttrium-aluminum-garnet] capsulotomy (no records)/iris atrophy/loose sutures/chronic uveitis for which testing has been done with no results to see if related to TB, syphilis etc./[contact lens] presently/[binocular visual acuity] was 20/200 and most recently at WVU in 2-11-16 FC[10] at 1 inch.
>
> LEFT eye: BVA is 20/50 /no leakage with FA so no [contact lens]/On 2-11-16 WVU visit he was to see me in 3 weeks (today) for a refraction. In reality, I was going to do a full exam since it had been one year.
>
> Today I explained that WVU wanted this exam done for glasses in his [left eye]. He said that he felt that the glasses were working great today and like them (he left them in his cell and didn't wear them for this visit because he said that the rain would discolor them???)  I told him that I was going to check his eyes to see if any other problems are still going on like the uveitis which was not being treated with drops presently. He said that he was going back to WVU soon to recheck everything, but I told him that I saw no notes that seem to show this. He said that he wanted to get back to work and didn't want to have his eyes checked this time… I discussed the reasons he should have this but he signed my notes after explaining the above to him stating that he denied this exam.

ECF No. 74-7 at 6.

 On July 7, 2016, the Plaintiff was scheduled to go to WVU ophthalmology for a follow-up, but he refused to go to the ophthalmology exam. The Plaintiff signed the refusal slipped that warned him that refusing treatment could result in worsening condition, misdiagnosis, blindness or death. ECF No. 74-8 at 9.

On June 23, 2017, the Plaintiff was examined by a contract optometrist. The Plaintiff told the optometrist that he was supposed to see WVU in June  2016 for a follow-up, but that he wanted to eat lunch and this was misunderstood as refusing the

---

[10] The undersigned believes FC to stand for "finger counting." http://www.lnctips.com/visualacuity.

visit. The Plaintiff's long history of eye problems was listed. The optometrist noted that there was no sign of uveitis present, but due to the complexity of his right eye, the contract optometrist indicated it would be nice to get some closure from WVU as far as his eyes were concerned. The left eye was noted to have a changed prescription and his [visual acuity] was not correctable to 20/20.  He had fairly dense cataract present in his left eye but "[n]othing should be done about it yet." Another ophthalmology consultation was requested by the optometrist for a second opinion. ECF No. 74-9 at 7-10. This appears to be the final medical report of record that deals specifically with the Plaintiff's eye conditions.

### III. The Pleadings

#### A.  The Amended Complaint

In his amended complaint, the Plaintiff alleges that there is ample evidence from which to infer that his loss of sight was caused by Dr. Anderson's continued delay in affording him the surgery that was initially scheduled for August 23, 2010. The Plaintiff further alleges that these undocumented delays of unknown origin have caused a lifelong handicap and permanent loss.  The Plaintiff also alleges that a detached retina is a serious medical condition. The Plaintiff alleges that his "overall condition causes him to suffer [severe] pain, discomfort and mental distress [and] [a]ssociated difficulties includ[ing]: reading, instability in gauging distance and other chronic symptoms. ECF No. 61 at 3. Finally, the Plaintiff maintains that "it forecast that there is a strong possibility there is a lack of acuity in the remaining good eye cause[d] by a cataract due to the good eye having to over compensate for the bad eye, which could lead to loss of vision in both eyes." Id.  Although the Plaintiff makes no specific claim for relief, the undersigned notes

that his original complaint sought damages in the amount of $2,000,000 against each Defendant.

## B.  Motion to Dismiss/Motion for Summary Judgment

First, the Defendant argues that the Plaintiff's claims must be dismissed for failure to file within the statute of limitations. Second, the Defendant argues that the Plaintiff cannot establish an Eighth Amendment violation for deliberate indifference. Finally, the Defendant alleges that because no constitutional violations occurred, he is entitled to qualified immunity.

## C. Response

In response to the Motion to Dismiss/Summary Judgment, the Plaintiff maintains that the 23 page statement of facts in an inflated and padded account of the facts. The Plaintiff notes that his primary claim is the Defendant delayed surgery for his detached retina. He also asserts that the Defendant was aware of the need for surgery and was responsible for making sure that the surgery was performed. The Plaintiff contends that the surgery was delayed for a full two years from April 2010, until February 2012, and this delay caused permanent damage to his right eye and vision problems with his left eye.  The Plaintiff then focuses on what he believes demonstrates Dr. Anderson's deliberate indifference. Specifically, he notes on April 7, 2010, he had his initial eye exam at the WVU Eye Institute, at which time a recommendation for surgery was made to be done as soon as possible. Four months later, on August 23, 2010, he was sent for laser surgery which was not done. The Plaintiff argues that by assuming that it was done, doing nothing to follow up or even examine him to see if the results were positive, not contacting WVU to find out when there should be follow up care, and not inquiring

why there were no WVU results, the Defendant simply ignored the situation and was uncaring as to whether the surgery was successful or not.

**D.  Reply**

      The Defendant notes the Plaintiff's assertion that his claim is a delay in eye surgery from April 2010 until February 2012. The Defendant then notes that the statute of limitations defense was raised and fully briefed in his Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. The Defendants calls to the court's attention the fact that the Plaintiff's response does not address his assertion that the statute of limitations bars this claim. In addition, the Defendant maintains that the Plaintiff's claim that he should have followed up, and not assumed the laser surgery was done is, at most, a claim of negligence which does not rise to the level of deliberate indifference.

## IV.   Legal Standard

**A.  Motion to Dismiss**

      In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations.  Advanced Health-Care Services, Inc., v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990).  Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

      When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be

construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## B.   <u>Motion for Summary Judgment</u>

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).    The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."   <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id.</u>  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but  . . .  must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 256.  The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment.  <u>Id.</u> at 248.  Summary judgment is proper only "[w]here the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

Plaintiff is proceeding *pro se* and therefore, the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97 (1976); Haines v. Kerner, 404 U.S. 519 (1972) (*per curiam*); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leake, 574 Fed 2nd 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, 404 U.S. at 520 – 21. The mandated liberal construction means only that of the court can reasonably read the pleadings to state a valid claim on which Plaintiff could prevail, it should do so. Barnett v. Hargett, 174 Fed 3rd 1128 (10th Cir. 1999). However, a court may not construct plaintiff's legal arguments for him. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

## VI.   Analysis

### A.   Timeliness of the Plaintiff's Complaint

For purposes of determining the appropriate statute of limitations, claims filed pursuant to 42 U.S.C. § 1983 are analogous to "general personal injury actions." Wilson v. Garcia, , 471 US 261, 279 (1985). Thus, there timeliness is determined based upon the relevant state limitations period for personal injury actions. Because Bivens is the federal equivalent to an action under § 1983, federal courts have consistently extended the state general personal injury statute of limitations to Bivens cases as well as § 1983 claims. See, e.g., Chin v. Bowen, 833 F.2d 21, 23-24 (2d Cir. 1987). In fact, the Fourth

Circuit Court of Appeals has determined that West Virginia's two-year statute of limitations contained at West Virginia Code 55-2-12(d)  is appropriately applied in Bivens actions. See Reinhold v. Evers, 187 Fed third 348, 359, n. 10 (4th Cir. 1999).

The District Court has already recognized this time restriction. More specifically, in its Order dated May 18, 2017, permitting the Plaintiff to file an amended complaint, it noted that "unless equitable tolling applies, he can only assert causes of action that accrued on or before July 2, 2013." ECF No. 59 at 12.

With respect to the Plaintiff's claims against Dr. Anderson, the only remaining Defendant, the Plaintiff clearly alleges that his claim is based on the delay in surgery between August 23, 2010, and February 27, 2012, when the surgery for the detached retina in his left eye was finally performed. In addition, despite the Defendant raising the statute of limitations as a defense, the Plaintiff, in his response, remains focused on the two year delay in surgery, and the Defendant's failure to follow up on why surgery was not performed as initially scheduled on August 23, 2010.

"Under federal law a cause of action accrues when the Plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim v. Warden, Maryland House of Correction, 64 F.3d 951, 955 (4th Cir. 1995). In other words, "a federal cause of action accrues upon inquiry notice." Id. In the instant case, it is clear that the Plaintiff was aware of the delay in surgery, and was aware that it was not performed until February 27, 2012.

The undersigned recognizes that the statute of limitations is tolled while a plaintiff exhausts his administrative grievances as required by the Prison Litigation Reform Act.

The Bureau of Prisons provides a four-step administrative process beginning with

attempted informal resolution with prison staff (BP-8).  If the prisoner achieves no satisfaction informally, he must file a written complaint to the warden (BP-9), within 20 calendar days of the date of the occurrence on which the complaint is based.  If an inmate is not satisfied with the warden's response, he may appeal to the regional director of the BOP (BP-10) within 20 days of the warden's response. Finally, if the prisoner has received no satisfaction, he may appeal to the Office of General Counsel (BP-11) within 30 days of the date the Regional Director signed the response.  An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels.  28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

The Plaintiff filed two sets of administrative grievances while in the custody of the BOP. The Plaintiff filed Administrative Remedy  ID No. 653147 at the institutional level on August 23, 2011, requesting eye surgery which he notes was approved by Grand Prairie.[11] This remedy is clearly related to the amended complaint, and the Plaintiff exhausted this remedy at the Central Office level on May 31, 2012.. ECF No. 36-1 at 3. However, because the remedy was exhausted more than three years before the Plaintiff filed his initial complaint, and more than five years before he filed his amended complaint, this grievance clearly does not salvage the timeliness of the Plaintiff's pending claim against Dr. Anderson.

The second grievance, Remedy ID No. 718988, was filed at the facility/institutional level on January 13, 2013. The Plaintiff raised issues concerning the treatment of his TB and his assertion that during his treatment with Rifampin, he began

---

[11] Although not clear, this Court believes that the Plaintiff may be referring to the Utilization Review Committee

to experience eye problems. The administrative remedy process was exhausted on June 19, 2014, when the Central Office provided an informational response. ECF No. 36-1 at 3. Although completed after the relevant date of July 2, 2013, this grievance does not relate to the Plaintiff's sole claim in his amended complaint, the delay in his initial surgery, and therefore, it cannot act as a tolling event.

Accordingly, the Plaintiff cannot overcome the affirmative defense of statute of limitations raised by the Defendant. Therefore, this case is due to be dismissed. Moreover, even if the Court were to toll the limitations period through the completion of the second administrative grievance, and deem the Plaintiff's amended complaint filed as of July 1, 2015, when this case was originally opened, the case is still due to be dismissed for the reason discussed below.

**B.   <u>Deliberate Indifference</u>**

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990), <u>cert.denied</u>, 500 U.S. 956 (1991). A medical condition is

also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[12]

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference.   Wilson, 501 U.S. at 303.   A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S.  825, 835 (1994).  A prison official "must both be aware of facts from which the inference could be  drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.  A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that  the risk to which the fact gave rise was insubstantial or nonexistent."  Id. at 844.

---

[12] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2d Cir. 1998). A degenerative hip a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

Liberally construed, the Plaintiff's sole allegation against Dr. Anderson is that he is responsible for the delay in surgery for the right eye detached retina; a delay from August 23, 2010, until February 27, 2012. In addition, the Plaintiff alleges that this delay resulted in a lifelong handicap and permanent loss. The Defendant acknowledges that a detached retina qualifies as a serious medical condition. Therefore, the undersigned need not address the objective component and turns to the subject component of an Eighth Amendment claim related to medical care.

In discussing the subjective component, this Court noted it required a showing that the Defendant has "'actual knowledge of the risk of harm' and that 'his actions

were insufficient to mitigate the harm to the inmate arising from his medical needs.'" ECF No. 59 at 21, citing Iko v Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Dr. Anderson has supplied a Declaration.  ECF No. 74-1. In it, he knows that he is not an optometrist nor is he an ophthalmologist. Rather, he is a general practitioner and not an eye specialist in any way. Id. at ¶ 12. Moreover, Dr. Anderson explains that he did not have actual knowledge of the risk of harm for any delay in surgery, because he was not aware that the Plaintiff did not receive the needed treatment on August 10, 2010, when he was sent to WVU. Id. at ¶ 112.

As previously noted, the Plaintiff was sent to WVU ophthalmology on August 23, 2010, for the previously recommended laser therapy of the right retina. There is no indication in the FCI Gilmer medical records, that Dr. Anderson received anything from WVU ophthalmology until January 31, 2011, when a two-page medical note was scanned into the BEMR system. Dr. Anderson initialed this record at the top of the page.

The August 23, 2010, WVU indicates that the Plaintiff's vision was unchanged from the April visit and, and they were informed by the Plaintiff that the lab results were so far negative. The impression was suspected infectious etiology/pending lab work up. Upon review, this record appeared to Dr. Anderson to indicate that the Plaintiff actually had surgery at that time. It indicates, "PPV/Traction RD repair OD 2.5 hours General c HSV PCR." Dr. Anderson interpreted this to mean WVU did surgery on the right retinal detachment under general anesthesia for 2.5 hours and collected PCR sample to check for HSV. Dr. Anderson did not find any follow-up recommendations in that note other than "pending lab."

Evidence submitted by the Plaintiff is consistent with Dr. Anderson's belief that surgery was done on August 23, 2010. The Plaintiff submitted records to the court from WVU dated August 23, 2010, which are not part of the FCI Gilmer medical records. ECF No. 61-2, at 4-6. The records he submitted contain a medication order sheet for medications to be used "in the surgical site." Id. at 4. An additional page also shows the date of August 23, 2010, and states, "Admit to The same Day Surgery Center" and has OR orders. Id. at 5. The Plaintiffs submitted evidence is consistent with Dr. Anderson's belief that he went to WVU on August 23, 2010, for the actual laser treatment.

On October 31, 2011, the Plaintiff was seen by an optometrist for routine care, and the optometrist recommended another WVU consultation based upon what the Plaintiff had told him. It was only after this optometrist's report, that Dr. Anderson became aware that something additional was needed. It is telling to note that the very next day, Dr. Anderson made a request for an ophthalmology consult that ultimately was approved and led to the retinal attachment surgery on February 27, 2012. Moreover, the records after that date indicate that the Plaintiff was provided timely and appropriate follow-up care as directed by both the contract optometrist's and the WVU Eye Institute, including additional surgery on November 17, 2013 and December 8, 2014, and August 10, 2015.

It is clear that the Plaintiff has no vision remaining in his right eye. It is debatable whether the delay in surgery was the cause of his loss of vision. However, given the sequence of events in the medical records that have been provided, there is no evidence to establish that Dr. Anderson was deliberately indifferent. To the extent that

Dr. Anderson may have been negligent in his misunderstanding of what occurred and what needed to be done after the August 23, 2010 "aborted" surgery, this is not deliberate indifference. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. "Estelle v. Gamble, 429 U.S. 97, 106 (1976).

### VII. Recommendation

Accordingly, for the foregoing reasons, the undersigned **RECOMMENDS** that the Defendant's Motion to Dismiss or, in the alternative, Motion for Summary Judgment [ECF No. 73] **be GRANTED**, and the Plaintiff's Amended Complaint [ECF No. 61] **be DISMISSED**.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objections are made and the basis for such objections. A copy of any objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

This Report and Recommendation completes the referral from the District Court. The Clerk is **DIRECTED** to terminate the Magistrate Judge's association with this case.

The Clerk is further **DIRECTED** to send a copy of this Report and

Recommendation to Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record by electronic means.

DATED: July 9, 2018

*/s James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE